IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| RODNEY ST. JOHN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | 09-0709-CV-W-REL-SSA |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Rodney St. John seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits under Title II of the Social Security Act ("the Act"). Plaintiff argues that the ALJ failed to consider all of the treatment notes of psychiatrist Daniel Spurlock, the ALJ erred in finding that plaintiff's mental impairment and his hand impairment are non-severe impairments, and the ALJ failed to consider plaintiff's excessive absenteeism to seek medical treatment as disabling. I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

## I.   BACKGROUND

On August 29, 2006, plaintiff applied for disability benefits alleging that he had been disabled since September 25,

2005.  Plaintiff's disability stems from back and neck pain and
depression/anxiety.  Plaintiff's application was denied on
October 13, 2006.  On February 5, 2009, a hearing was held before
an Administrative Law Judge.  On April 14, 2009, the ALJ found
that plaintiff was not under a "disability" as defined in the
Act.  On July 17, 2009, the Appeals Council denied plaintiff's
request for review.  Therefore, the decision of the ALJ stands as
the final decision of the Commissioner.

## II.  *STANDARD FOR JUDICIAL REVIEW*

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for
judicial review of a "final decision" of the Commissioner.  The
standard for judicial review by the federal district court is
whether the decision of the Commissioner was supported by
substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales,
402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847,
850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th
Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir.
1996).  The determination of whether the Commissioner's decision
is supported by substantial evidence requires review of the
entire record, considering the evidence in support of and in
opposition to the Commissioner's decision.  Universal Camera
Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876
F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into

consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." <u>Wilcutts v. Apfel</u>, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing <u>Steadman v. Securities & Exchange Commission</u>, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. at 401; <u>Jernigan v. Sullivan</u>, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." <u>Id</u>.; <u>Clarke v. Bowen</u>, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III. *BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS*

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other

type of substantial gainful activity in the national economy that the plaintiff can perform.  Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled.  These regulations are codified at 20 C.F.R. §§ 404.1501, et seq.  The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.   Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.   Does the claimant have a severe impairment or a combination of impairments which significantly limits his/ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.   Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.   Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes =  go to next step where burden shifts to Commissioner.

5. Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV. THE RECORD

The record consists of the testimony of plaintiff and vocational expert Jeanine Metildi, in addition to documentary evidence admitted at the hearing.

## A. ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

## Earnings Record

The record establishes that plaintiff earned the following income from 1983 through 2008:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1983 | $ 2,991.00 | 1996 | $41,538.58 |
| 1984 | 3,690.44 | 1997 | 37,075.00 |
| 1985 | 10,671.25 | 1998 | 43,220.54 |
| 1986 | 13,811.28 | 1999 | 45,674.20 |
| 1987 | 8,731.30 | 2000 | 24,559.90 |
| 1988 | 11,778.40 | 2001 | 40,874.60 |
| 1989 | 25,454.59 | 2002 | 52,441.59 |
| 1990 | 36,191.13 | 2003 | 12,104.23 |
| 1991 | 32,844.10 | 2004 | 19,553.17 |
| 1992 | 35,572.57 | 2005 | 20,327.55 |
| 1993 | 35,925.38 | 2006 | 0.00 |
| 1994 | 40,123.38 | 2007 | 0.00 |

| 1995 | 43,697.10 | 2008 | 0.00 |

(Tr. at 100).

**Function Report**

In a Function Report dated September 19, 2006, plaintiff reported no difficulty with personal care, making sandwiches, and warming up food in the microwave (Tr. at 132-134). He reported that when he goes out, he drives, walks, or rides in a car and is able to go out alone (Tr. at 134). He specifically stated that he can only drive for about a half an hour before he experiences back spasms (Tr. at 134). Plaintiff was asked to circle all items affected by his condition; he did not circle memory, concentration, understanding, following instructions, or using his hands (Tr. at 136). He specifically wrote that he does not have a problem paying attention, that he does fine following both written and spoken instructions, and that he starts what he finishes (Tr. at 136). He handles changes in routine "fine" but does not handle stress well without his medication (Tr. at 137). When asked whether he uses a cane or a walker, plaintiff indicated he did not (Tr. at 137).

**B.   *SUMMARY OF MEDICAL RECORDS***

Plaintiff underwent a lumbar fusion in 2000 and a diskectomy at C3 and C6 in 2003 (Tr. at 280, 561). In late 2005, plaintiff reported "pain in the right upper quadrant radiating to his upper

6

back and down into the right hip sacral region and buttocks" (Tr. at 206-210, 224, 317). An "extensive workup" was negative and failed to establish an etiology for the pain (Tr. at 224-225, 227, 244-45, 317). Two weeks of physical therapy "produced some temporary relief" (Tr. at 276, 325-326). However, plaintiff continued to report pain, and the physical therapist recommended further testing to rule out a medical condition (Tr. at 204, 206, 322-323).

In January 2006, plaintiff reported that due to his "persistent discomfort," he could not return to his vending machine job which involved twisting, lifting, and walking (Tr. at 276). The treating physician diagnosed plaintiff with "[u]pper back pain of probable myofascial[1] nature" and thoracic spondylosis[2] (Tr. at 278). He noted that plaintiff's pain did "not appear to be radicular" (Tr. at 278). He prescribed medication for sleep disturbance and recommended physical therapy (Tr. at 278).

That same month, plaintiff underwent a series of diagnostic tests. A magnetic resonance imaging ("MRI") scan of the thoracic spine revealed small central protrusion at T6-7 and mild

---

[1]Of or relating to the fascia -- fibrous tissue enclosing muscles or groups of muscles.

[2]Spondylosis is the narrowing of the disc space between vertebrae, which makes the disc more likely to herniate or bulge.

spondylitic changes at T8-9 (Tr. at 223, 232, 236). It showed no "significant canal or nerve root abnormality" and "no acute process" in the dorsal spine (Tr. at 232, 236). An x-ray of the cervical spine also revealed "[n]o acute process" (Tr. at 235). It showed "straightening of the normal curve" and degenerative disc disease and spondylosis at C5-6 (Tr. at 235). Similarly, an x-ray of the lumbar spine revealed "[n]o acute process" and "[s]atisfactory postoperative appearance" (Tr. at 234, 314). Another x-ray revealed a "[n]ormal left shoulder" with no fractures (Tr. at 233, 315). Finally, an EMG of the thoracic spine "was essentially normal without electrophysiologic evidence to support the diagnosis of radiculopathy"[3] (Tr. at 221).

One month later, plaintiff reported improved sleep and back pain, which he said "no longer radiate[d] anteriorly" (Tr. at 279). Plaintiff was "very depressed" the following month after his pet hamster died (Tr. at 203). One month later, his depression was "much, much better," though he was still having difficulty sleeping (Tr. at 201). After a cervical epidural injection, plaintiff reported "significant improvement" in his neck and back (Tr. at 280-82). Plaintiff also said that physical

_____

[3]Pain, numbness, tingling or weakness in arms or legs caused by a problem with the nerve roots -- branches of the spinal cord that carry signals to the rest of the body at each level along the spine.

therapy had "helped him somewhat" (Tr. at 282).

In May 2006, plaintiff reported "a severely painful left neck" and pain in his back and head (Tr. at 201-02).  He received two thoracic epidural steroid injections in June 2006 (Tr. at 268-69, 271-72).

One month later, plaintiff was feeling "better" (Tr. at 200).  He had less pain in his lower back and neck and no radicular pain in his thoracic spine (Tr. at 200).

In October 2006, plaintiff fell and sustained a left hip contusion (Tr. at 550).  He reported to the emergency room with dizziness and weakness in his left arm and leg (Tr. at 561).  X-rays of plaintiff's pelvis and hip were "negative" and "unremarkable" (Tr. at 540, 550, 562, 570-571).  An MRI of the cervical spine revealed right lateral disc bulges at C5-6 and C6-7 with mild stenosis (Tr. at 554).  A CT scan showed similar results (Tr. at 571).  An MRI of the lumbar spine showed "no evidence of disc protrusion," stenosis, or epidural fibrosis (Tr. at 552, 562).  A CT scan of the head was likewise unremarkable, as was an MRI of the brain (Tr. at 555, 562, 566).  An ultrasound revealed "[n]o evidence of left lower extremity deep venous thrombosis"[4] (Tr. at 539).  Plaintiff's left leg, arm, and lower back improved during his hospitalization (Tr. at 562).  The

---

[4]Blood clot in the legs.

treating physician discharged plaintiff with a walker and advised home physical therapy (Tr. at 562-63).

Over the next month, plaintiff's weakness had "progressively gotten better enough to the point where he could walk with a cane" (Tr. at 532). Additional diagnostic testing in November 2006 was inconclusive. A magnetic resonance angiogram[5] ("MRA") scan and an MRI revealed a normal brain (Tr. at 535-536). An MRI of the thoracic spine revealed a "focal central disc protrusion" at T6-7 with mild to moderate stenosis [narrowing] and "[m]inimal left paracentral focal disc protrusions at T8-9 and T9-10" with no significant stenosis (Tr. at 354, 402, 404).

That same month, plaintiff reported to the emergency room after "an acute episode where after eating a few bites of food he became weak from the neck down" (Tr. at 374, 532). An examining physician noted that "[o]n physical examination there are certainly no signs of a myelopathy"[6] (Tr. at 395, 522). He wondered if plaintiff's "mild weakness" was "effort related" (Tr. at 395, 522). He noted that diagnostic tests were "rather unremarkable," except for the thoracic spine MRI, which showed a

---

[5]A magnetic resonance angiogram is a type of MRI scan that uses a magnetic field and pulses of radio wave energy to provide pictures of blood vessels inside the body. In many cases MRA can provide information that cannot be obtained from an X-ray, ultrasound, or computed tomography (CT) scan.

[6]Something wrong with the spinal cord itself.

non-severe disc bulge at T6-7 (Tr. at 395, 522).  Nonetheless, he stated that he "would be very surprised if this was the cause" of weakness in the legs (Tr. at 395, 522).  He had "strong doubts" that plaintiff's thoracic spine required surgery (Tr. at 395).

Another examining physician noted that plaintiff's symptoms "seem[ed] too short-lived to be attributed to significant conditions causing paralysis" (Tr. at 391).  Plaintiff "improved with physical therapy" during his hospitalization and was discharged (Tr. at 375, 533).

Plaintiff was referred to Daniel Spurlock, D.O., to determine if depression and anxiety "play[ed] some role in his symptoms" (Tr. at 396, 446-448, 504, 515-516).  Dr. Spurlock noted "a past diagnosis" of bipolar disorder, but he did not believe that disorder was "very well substantiated at this time" (Tr. at 397, 446, 504).  Plaintiff reported no psychotic symptoms or suicidal thoughts (Tr. at 447, 515).  A mental status examination revealed normal speech, memory, thought process, insight, judgment and intellect (Tr. at 447-448, 515-516).  Dr. Spurlock concluded that anxiety "could" be contributing to plaintiff's neurological symptoms (Tr. at 399).  Dr. Spurlock's report reads in part as follows:

> **REASON FOR CONSULTATION**:  Evaluation of depression and anxiety.

**HISTORY OF PRESENT ILLNESS**: The patient is a 41-year-old Caucasian male with a long history of depression and anxiety. He is currently followed by Dr. Hill as an outpatient where he is treated for these. He also describes a past diagnosis of bipolar mood disorder, however, does not give a good history of past manic episodes other than labile mood. The patient has been seen before in the hospital for vague neurological complaints and was recently admitted with complaints of numbness and pain in his extremities as well as weakness in both upper and lower extremities. He has been seen by Neurology and has had MRI and MRA performed with no clear etiology for the patient's stated symptoms. The patient does note that his anxiety is currently not controlled by his medications, is keyed up and on edge much of the time, difficulty turning his thoughts off at night in order to sleep, is unable to sleep for nights at a time even with the use of Ambien, then after two or three nights of very poor sleep will have a night where he gets an 8 hour period of sleep. Energy is described during these times as fine. He also complains of significant muscle tension with relation to his anxiety. Mood is described as up and down. The patient at least implies that he gets somewhat dysthymic or dysphoric because of his physical symptoms having no explanation and having been out of work for the past year.

**PAST PSYCHIATRIC HISTORY**: Again the patient has a past diagnosis apparently of bipolar mood disorder. I don't feel that that is very well substantiated at this time, but his major symptoms seem to be anxiety as well as depression. In the past he has been seen by Dr. Chinnaswame and is currently being seen by Dr. Hill, but at this point has only seen him one time in April and has not followed up since that time. The patient has two prior psychiatric hospitalizations in Smithville. He denies any past suicide attempts and denies any close family or friends who have committed suicide. The patient is currently on Depakote 250 mg twice daily, Cymbalta 60 mg daily and Xanax 0.5 mg four times daily as needed. The patient states that psychiatrists have tried to lower his dose of Xanax as he had been taking 7-8 tablets a day in the past and had been weaned down to three tablets a day and is currently back up to four tablets.

**PAST MEDICAL HISTORY**: Significant for hypertension and prior back injury for which the patient has currently been out of work for the past year. He has had a cervical

diskectomy in October of 2004 as well as a lumbar disk
fusion.

* * * * *

**SOCIAL HISTORY:**  The patient is a 41-year-old Caucasian male
who has been married for approximately 20 years.  He has a
high school education as well as two years of vocational
training and one year of millwork training.  He has two
daughters ages 18 and 19.  He is currently on disability,
which runs through December of 2007.  According to the
patient he is in the process of applying for social security
disability.  He has been rejected once for that, but is in
the process of reapplying.  He denies any history of mental,
physical or sexual abuse.  He denies drinking alcohol, any
use of drugs or any history of seizures, although he does
note that he has had several concussions in the past.

* * * * *

**MENTAL STATUS EXAMINATION:**  The patient is a 41-year-old
Caucasian male who appears his stated age.  He is lying
supine in bed wearing hospital garb, pleasant, cooperative
with good eye contact, alert and oriented x4, appears to be
mostly reliable historian.  Mood is described as "up and
down".  Affect is somewhat blunted.  Thought processes are
linear.  The patient denies any suicidal ideation.  There is
no evidence of delusions or other psychotic symptoms
present.  Short-term memory appears to be intact as
evidenced by patient's ability to recall the events leading
up to this hospitalization.  Long-term memory appears to be
intact as evidenced by patient's ability to recall events
from this in the past as well as his psychiatric and medical
histories including medication doses and what changes he has
had in his medications.  Speech is regular rate and volume.
Insight, judgment and impulse control appear to be mostly
intact.  Intellect appears to be average as evidenced by
patient's fund of knowledge and vocabulary.

**IMPRESSION:**
  1.    Bilateral upper and lower extremity weakness.
  2.    Generalized anxiety disorder.
  3.    Major depressive disorder recurrent, mild to
moderate.

There could certainly be EA reaction.  With regards to the
patient's current neurological symptoms anxiety could
significantly play a role in this.  Will go ahead and
increase his Cymbalta to 30 mg three tablets once a day for
him to start as an outpatient.  Have discussed the need for
him to follow up with Dr. Todd Hill for outpatient
psychiatric medication management.  He is agreeable to doing
this as is his wife.  Will not make any changes to his Xanax
at this time.

Plaintiff was referred to Yunxia Wang, M.D., a neurologist,

in January 2007 (Tr. at 350-351, 499-500).  A mental status

examination revealed "fluent [speech] with normal comprehension"

and normal short- and long-term memory (Tr. at 351, 500).

Plaintiff had "[s]ome giveaway weakness in the left side," but

his strength was at least 4+ (Tr. at 351, 500).  Dr. Wang noted

that plaintiff had no symptoms of myelopathy such as spasticity,

increased reflex, or bladder involvement (Tr. at 351, 500).  Dr.

Wang did not believe the thoracic disc was the cause of

plaintiff's symptoms (Tr. at 351, 500).

In February 2007, Dr. Wang referred plaintiff to Paul

Arnold, M.D., a neurosurgeon, for a second opinion (Tr. at 337,

351-352, 500).  Plaintiff reported symptoms of Bell's palsy[7] on

the left side of his face (Tr. at 336, 355).  Upon examination,

plaintiff demonstrated 4+ strength in all muscle groups on the

left side (Tr. at 336, 355).  Dr. Arnold noted that the MRI of

---

[7]Bell's palsy is a temporary form of facial paralysis that
occurs with damage to the nerve that controls movement of the
muscles in the face.

plaintiff's cervical spine "looks okay," and the MRI of his thoracic spine "shows a herniated disk" (Tr. at 336, 354-355).

One month later, plaintiff followed up with Dr. Wang (Tr. at 488-489). Another mental status examination was normal (Tr. at 359, 488). Plaintiff's motor strength was again "at least 4+" (Tr. at 359, 488). Plaintiff reported that his left-sided weakness had "somewhat improved" (Tr. at 360, 489). However, he still had numbness in his face (Tr. at 360, 489). Dr. Wang again noted that the thoracic disc was not "the culprit of [plaintiff's] symptomatology" (Tr. at 360, 489).

By April 2007, plaintiff had "recovered from his Bell's palsy" (Tr. at 483). That same month, plaintiff was referred to George Varghese, M.D., and Kim Poecker, D.O., for another opinion concerning his physical symptoms (Tr. at 478-482). They observed full range of motion, no muscle spasms, and "mild tenderness" in the lumbar spine and thoracic spine (Tr. at 344, 478, 481). Plaintiff also had "no definite sensory loss . . . along the trunk" (Tr. at 344, 478). They concurred with Dr. Wang's opinion that there was no "evidence of myelopathy on the imaging studies reviewed or on physical exam" (Tr. at 365, 481). They recommend-ed home exercise therapy, but plaintiff left the office prior to receiving the prescription (Tr. at 365, 478, 481-482). Dr. Varghese noted that he mailed the prescription to plaintiff but

was unsure if plaintiff would undergo physical therapy (Tr. at 344, 478).

Plaintiff injured his right knee and left ankle when he fell in September 2007 (Tr. at 472). A CT scan of the head was negative (Tr. at 372, 475). Similarly, a right knee x-ray revealed minimal fluid and no definite acute bony abnormality (Tr. at 371, 473). Plaintiff returned to Dr. Wang in November 2007 (Tr. at 367). Dr. Wang noted that another MRI of the head did not reveal any intracranial lesion to explain new onset of right face numbness (Tr. at 367). In addition, a myelogram showed disc protrusions at T6-7, T7-8, and T8-9 (Tr. at 367). A mental status examination showed normal speech and memory (Tr. at 367). A neurological examination revealed normal strength on the left and right side (Tr. at 367). Dr. Wang continued the pain management and made no changes to plaintiff's treatment (Tr. at 368).

Plaintiff began treatment with Dr. Spurlock for depression and anxiety in March 2008 (Tr. at 450-51).

> Most days depressed. Was sleeping a lot on the lexapro initially, but that has resolved. Sleep fluctuates. Energy is "not really great." Spending most of time on couch watching tv. Appetite is reportedly low. No weight loss. Denies any suicidal ideation. Distractible during evaluation. Hopelessness and helplessness. Disability was cancelled, so patient is without that paycheck. Denies suicidal ideation.

* * * * *

Psychiatric: behavior/psychomotor activity, behavior; a normal exam and psychomotor activity: a normal exam; mood and affect, mood: depressed and anxious; appearance, overall: well groomed, good eye contact; speech, overall: normal quality, no aphasia, normal quality, quantity, rate, quality: a normal exam and rate of production: a normal exam; thought, overall: normal form and content; cognition/ memory, concentration: Subjective complaints of poor concentration, able to stay focused during interview and intelligence: average; and, judgment/insight, Insight: a normal exam.

Dr. Spurlock assessed a GAF of 50 indicating moderate symptoms, generalized anxiety disorder, agoraphobia with panic disorder, and recurring major depression severe (Tr. at 450). He increased plaintiff's Lexapro from 20 mg. per day to 40 mg. per day (Tr. at 450).

On May 13, 2008, plaintiff saw Dr. Spurlock and reported "hopelessness and helplessness" (Tr. at 452). He was worried about whether he could afford to pay for his daughter's upcoming wedding (Tr. at 452). Examinations revealed normal speech, thought, judgment, and insight (Tr. at 450, 453, 455). Plaintiff was well groomed, had good eye contact, normal form of thought, normal content of thought, and partial judgment and insight. Plaintiff reported poor concentration. Dr. Spurlock assessed a GAF of 50-55 indicating moderately severe symptoms, recurrent major depression (severe), generalized anxiety disorder, and agoraphobia with panic disorder. He prescribed Abilify.

On June 25, 2008, plaintiff returned to see Dr. Spurlock (Tr. at 453). Plaintiff was not tolerating the Abilify as it caused increased anxiety, although he was not having panic attacks (Tr. at 453). Plaintiff complained of problems with focus and concentration, anxiety, sleep disturbance and disturbances of emotion but denied anger outbursts, panic attacks, mania, psychosis and suicidality. Dr. Spurlock observed plaintiff to be well groomed with good eye contact, normal speech, normal form of thought, normal content of thought, normal memory, normal concentration, normal intelligence, and normal judgment and insight. Facial movements were absent.

Dr. Spurlock assessed a GAF of 50 to 55 indicating moderately severe symptoms, agoraphobia with panic disorder, generalized anxiety disorder, and recurrent major depression (severe). He refilled plaintiff's Lexapro, told him to discontinue the Abilify, and recommended "daily exercise and proper nutrition." (Tr. at 453-454).

On July 30, 2008, plaintiff followed up with Dr. Spurlock (Tr. at 455, 584). Plaintiff said he was "doing pretty good" (Tr. at 455, 584). He reported depression, anxiety, and insomnia but no psychosis, mania, suicidal thoughts, hopelessness or helplessness (Tr. at 455, 584). Plaintiff denied dizziness and tingling in his extremities. Plaintiff was well groomed with

good eye contact, normal speech, normal rate of production, normal thought, normal content of thought, normal cognition, normal memory, and partial judgment and insight.  Dr. Spurlock noted "subjective complaints of poor concentration".  Dr. Spurlock prescribed Trazodone to help plaintiff sleep better and recommended "daily exercise and proper nutrition."

Plaintiff hurt himself in another fall in August 2008 (Tr. at 459).  He reported numbness in his left leg and arm and pain "going down the outside of his right leg down into his lateral foot" (Tr. at 459).  He also reported "a large knot in the mid lower back" (Tr. at 459).  That same month, an MRI of the lumbar spine revealed mild facet arthrosis at L4-5 and L5-S1 but no other significant abnormality (Tr. at 457).

On August 27, 2008, plaintiff returned to see Dr. Spurlock (Tr. at 582-583).  Plaintiff complained of poor concentration. He presented with a depressed and anxious mood.  He was well groomed with good eye contact, normal speech, normal thought, normal memory, partial judgment and partial insight.  Dr. Spurlock refilled plaintiff's medications and recommended "daily exercise and proper nutrition."  He noted that plaintiff's prognosis was fair to poor.  "I feel that patient is comfortable with his current situation and agree with the dependency issues described in his neuropsych testing.  I do not believe there is

much to motivate him to acknowledge any improvement in his emotional functioning."

On September 25, 2008, plaintiff was "incredibly depressed and negative" (Tr. at 580). Dr. Spurlock noted that plaintiff's increased depression was related to the absence of his wife and children, who were "spending more time away from him" (Tr. at 581). Plaintiff's daughters had returned to school and his wife had begun helping with a musical at school, leaving plaintiff home by himself more. Plaintiff's wife indicated that she "doesn't wait on him generally when she is home."

"He has no structured activities and has reasons to counter any suggestions. I spent a good deal of time talking with patient about the need for some productive activity in his life. I do not expect any improvement if [he] spends his whole life sitting on the couch. Patient says when he does anything slightly physical his back hurts more. Recommended starting slow and trying to build up to increased activity. Patient displays self-defeating attitudes."

Dr. Spurlock observed that plaintiff was pleasant and cooperative; however, he appeared disheveled and tired with a depressed and anxious mood. He had normal memory, normal concentration, partial judgment, and poor insight. Dr. Spurlock assessed a GAF of 50 to 55 indicating moderately severe symptoms.

He made no changes to plaintiff's medication, which had "helped slightly with his sleep" (Tr. at 581). He noted that plaintiff's worsened mood "appears to be related to his dependent personality traits. Wife and kids are spending more time away from him and so [he] is depressed. Once wife is home more to enable his dependency he should show some improvement in mood. Long term prognosis remains poor for any significant improvement as patient does not seem willing to make any significant changes and appears comfortable with status quo."

## C. *SUMMARY OF TESTIMONY*

During the February 5, 2009, hearing, plaintiff testified; and Jeanine Metildi, a vocational expert, testified at the request of the ALJ.

## 1. **Plaintiff's testimony.**

Plaintiff last worked in September 2005 at a job he held for about six months (Tr. at 25). Plaintiff is unable to work mainly due to back pain, neck pain, and hand issues (Tr. at 27). Sometimes his back pain radiates into his leg (Tr. at 27). Plaintiff's hands are very weak and he does not consistently have the ability to grip (Tr. at 27). When asked if he could use a keyboard, plaintiff said, "Not really" because he is anxious and his hands shake all the time (Tr. at 28-29). He is, however, able to use a knife, fork and spoon (Tr. at 29). Plaintiff is

not able to carry a plate with food on it because he uses a cane with his right hand and his left hand does not have the strength (Tr. at 29). Plaintiff said the heaviest weight he could carry with one hand is about five or six pounds (Tr. at 29). Dr. Pickett told him not to lift anything over ten pounds (Tr. at 29).

Plaintiff believes he can stand for about ten minutes at a time (Tr. at 28). He can walk on a flat surface for about five minutes, but he may be able to walk for ten minutes with his walker (Tr. at 28). He uses a cane all the time; but if he is not sure where he will have to walk, he brings his walker (Tr. at 28). Plaintiff's physical therapist prescribed the cane in 2007 (Tr. at 28).

Plaintiff cannot sit for long because his back locks up, he gets dizzy spells and he falls (Tr. at 30). He has not driven a car since October 2005[8] (Tr. at 30). When asked why he stopped driving, plaintiff said it was because he has a stick-shift car and his left leg does not work like it should (Tr. at 30). In November 2006 he lost all feeling in his left side (Tr. at 30). When asked why he stopped driving in 2005, plaintiff said it was because his back was hurting and he was getting dizzy spells (Tr. at 30).

---

[8]In a Function Report dated September 19, 2006, plaintiff reported he drives and is able to go out alone (Tr. at 134).

Plaintiff is being treated for depression (Tr. at 30). He has had a high level of anxiety for "quite a few years" (Tr. at 31).

Plaintiff spends a lot of time sitting in a recliner during the day (Tr. at 31). He sits for 20 to 25 minutes at a time, then gets up to stretch and walk (Tr. at 31-32). He does this approximately seven times per day (Tr. at 32). He will go outside and walk a little bit with his cane (Tr. at 31).

## 2.   Vocational expert testimony.

Vocational expert Jeanine Metildi testified at the request of the Administrative Law Judge. The first hypothetical involved a person limited to light work but who could only occasionally engage in all posturals except could never climb ladders, scaffolds or ropes and should avoid concentrations of extreme heat and vibration (Tr. at 33). The vocational expert testified that such a person could work as an office helper, D.O.T. 239.567-010, with 57,000 in the nation and 3,000 in Missouri (Tr. at 33).

The next hypothetical involved a person with the same limitations except the person could do no more than sedentary work (Tr. at 33). The vocational expert testified that the person could be an assembler, D.O.T. 734.687-018, with 11,000 in the nation and 700 in Missouri; a table worker or visual

inspector, D.O.T. 739.687-182, with 42,000 in the national and 300 in Missouri; or an automatic grinding machine operator, D.O.T. 690.685-194, with 4,000 in the country and 250 in Missouri (Tr. at 33-34).

The next hypothetical was the same as the previous except the person had impaired concentration, attention, persistence and pace which would require a five- to ten-minute break every two hours due to depression (Tr. at 34). The vocational expert testified that the person could still perform the same jobs (Tr. at 34).

The vocational expert testified that the maximum number of days a person could miss and maintain employment is about one per month (Tr. at 34).

## V. *FINDINGS OF THE ALJ*

Administrative Law Judge Robert Evans entered his opinion on April 14, 2009 (Tr. at 11-21).

Step one. Plaintiff has not engaged in substantial gainful activity since his alleged onset date (Tr. at 13).

Step two. Plaintiff suffers from degenerative disc disease of the cervical, thoracic and lumbar spines, a severe impairment (Tr. at 13).

Step three. Plaintiff's impairment does not meet or equal a listed impairment (Tr. at 13).

Step four.  Plaintiff retains the residual functional capacity to perform sedentary work except occasional ramp/stair climbing; no ladder/rope/scaffold climbing; occasional balancing, stooping, kneeling, crouching and crawling; and should avoid concentrated exposure to extreme cold and vibration (Tr. at 13).

Plaintiff also suffers from mild restriction of activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation (Tr. at 18).

With this residual functional capacity, plaintiff is unable to return to his past relevant work (Tr. at 19).

Step five.  Plaintiff is capable of performing jobs available in significant numbers, such as assembler, D.O.T. 734.687-018, with 11,000 in the nation and 700 in Missouri; table worker, D.O.T. 739.687-182, with 42,000 in the country and 300 in Missouri; and automatic grinding machine operator, D.O.T. 690.685-194, with 24,000[9] in the country and 250 in Missouri (Tr. at 20).

---

[9]The ALJ listed the national number as 24,000, and in the transcript of the vocational expert's testimony, it is listed as 4,000.  Clearly one is a typographical error.  However because it is not the only job listed, this discrepancy is irrelevant to the outcome of this case.

## VI.  DR. SPURLOCK

Plaintiff argues that the ALJ erred in referring to normal mental status "examinations" in Dr. Spurlock's records when in fact there is only one reference to a mental status examination; and that the ALJ, in finding that Dr. Spurlock's records do not support a finding of a severe mental impairment lasting at least 12 months, did not mention the four treatment records dated prior to the November 15, 2006; April 9, 2007; February 29, 2008; and March 28, 2008, records discussed by the ALJ.  Additionally plaintiff points out that Gregory Barber, M.D., a gastro-enterologist, wrote on November 15, 2005, "He may have some depression"; Andrew Pickett, M.D., a primary care physician, noted that plaintiff became depressed when his hamster died and Dr. Pickett refilled plaintiff's Xanax; and Yunxia Wang, M.D., noted that plaintiff was "Significant for signs of depression, . . . nervousness."  All of these other doctors' entries, argues plaintiff, support Dr. Spurlock's records and mandate a finding that plaintiff's mental impairment was severe.

The ALJ had this to say about each of the doctors mentioned above:

Daniel Spurlock, M.D.

> Daniel Spurlock, M.D., is the claimant's treating psychiatrist.  Records from Dr. Spurlock since April 2, 2008 show medication follow ups with complaints of symptoms of depression.  However, the mental status examinations were

within normal limits except for depression and anxious mood
(Exhibits l7F/8-l4 and 22F).  Although the treatment records
from Dr. Spurlock since April 2008 show complaints of
symptoms of depression, the mental status examinations were
within normal limits except for depressed and anxious mood.
The mental status examinations do not show significant
deficits in the claimant's attention, concentration or
memory.  Thus, Dr. Spurlock's treatment records do not show
that the claimant has a severe mental impairment lasting for
a l2-month period.  The undersigned does not give any weight
to Dr. Bloom's opinion that it is likely that the claimant
would be easily overwhelmed by ordinary stressors and
responsibilities.  Dr. Bloom's evaluation showed test
responses that indicated a prominent anxiety disorder and
major depressive disorder with avoidant and dependent
personality traits.  As discussed above, however, the
repeated mental status examinations in Dr. Spurlock's
treatment notes were within normal limits except for
depressed and anxious mood.  The undersigned gives greater
weight to the findings in the longitudinal treatment records
than from Dr. Bloom's one-time evaluation.

(Tr. at 18).

Andrew Pickett, M.D.

Dr. Pickett stated in a letter dated December 12, 2007, that
the claimant was observed trying to walk at a shopping mall
and uses a cane and he has extreme difficulty keeping up
with even a slow walk with his family, "although his
findings are subjective he has marked objective inability to
walk, ambulate, sit or stand."   Dr. Pickett also stated
that the claimant's major problems are psychiatric, he
cannot sit, walk or stand for prolonged periods of time, and
he cannot work on a daily basis due to his subjective pain
"which causes objective findings with inability to walk
without a cane and being extremely weak" (Exhibit 18F/9).

David Peters, M.D., stated in a letter dated December 27,
2007, that he spoke to Dr. Pickett on December 26, 2007, to
provide medical consultation on behalf of an insurance
company, and Dr. Pickett acknowledged that other than the
thoracic spine MRI findings, there are no objective physical
or radiologic findings to explain the claimant's complaints
of pain, and Dr. Pickett opined that there is no objective
evidence of cognitive impairment (Exhibit 18F/7-8). . . .

Dr. Pickett stated in another letter . . . that the claimant has been unable to make much progress dealing with his subjectively debilitating pain, he cannot sit, walk or stand for prolonged periods of time, and he cannot work on a daily basis due to his subjective pain which causes objective findings with inability to walk without a cane and being extremely weak (Exhibit 19F).

Dr. Pickett completed an assessment form dated August 21, 2008, and assessed the claimant as unable to perform even sedentary work. Dr. Pickett acknowledged that he has not seen any objective evidence of the claimant's pain. When asked what objective findings are there of the claimant's pain, Dr. Pickett answered, "inability to ambulate or move [without] assistance." He later referred to the herniated thoracic disc noted on the MRI when asked to list the main clinical and laboratory findings that cause the limitations listed in the form (Exhibit 20F).

Progress notes from Dr. Pickett dated November 17, 2008, states [sic] that the claimant has tenderness over his back, upper arms, legs and has multiple trigger points. Dr. Pickett's impression was "fibromyalgia causing pain" (Exhibit 23F/2).

* * * * *

The undersigned does not give any weight to the assessments and disability opinions from Dr. Pickett, the claimant's family doctor. Dr. Pickett's assessments and disability opinions are not supported by objective findings. Rather, his assessments and opinions are based on the claimant's subjective pain and alleged limitations. Dr. Pickett also appears to confuse subjective and objective findings as he claims that the claimant's subjective findings cause objective findings (Exhibits 18F/9 and 19F). However, it does not change the fact that the findings referred to by Dr. Pickett in his assessments and opinions are subjective in nature. Dr. Pickett even admitted to Dr. Peters that other than the thoracic spine MRI findings, there are no objective physical or radiologic findings to explain the claimant's complaints of pain. Dr. Pickett also acknowledged in the August 21, 2008, assessment form that he has not seen any objective evidence of the claimant's pain. He later referred to the herniated thoracic disc noted on the MRI when asked to list the main clinical and laboratory

findings that cause the limitations listed in the form. As
noted above, however, the claimant's treating neurologist
does not believe that the findings from the thoracic spine
MRIs are the cause of the claimant's symptomatology.  The
undersigned gives greater weight to Dr. Wang's opinion on
this issue because she has specialized knowledge and
experience as a neurologist.

Dr. Pickett referred to "fibromyalgia causing pain" in
progress notes dated November 17, 2008.  However, the
treatment and consulting records do not show widespread
trigger points and other symptoms characteristic of
fibromyalgia.  No other doctor has diagnosed the claimant
with fibromyalgia.  The undersigned finds that the record
contains insufficient evidence to establish a diagnosis of
fibromyalgia.

(Tr. at 16-17).

<u>Yunxia Wang, M.D.</u>

The ALJ gave great weight to the opinion of Dr. Wang, a
neurologist, with respect to plaintiff's physical impairments.
He did not discuss Dr. Wang's comment that plaintiff was
"significant for signs of depression, . . . nervousness."

Plaintiff's first argument is wholly without merit.  The
fact that Dr. Spurlock's records only specifically refer to a
"mental status examination" one time does not mean that he
conducted only one mental status exam.  A mental status exam is
the basis for understanding the patient's presentation and
beginning to formulate a diagnosis.  "It can generally be done in
a few minutes. . . , and the vast majority of this you can get

from interviewing and simply watching the client carefully."[10]  A mental status exam consists of evaluating appearance (apparent age, basic grooming and hygiene, use of a cane, gait, motor, posture, any noteworthy mannerisms or gestures), manner and approach (open and friendly, cooperative, irritable, depressive, anxious, angry, frightened, lethargic, speech, eye contact, expressive language, comprehension, recall, memory), orientation, alertness and thought processes (orientation to person, place, time; alertness; coherence; concentration; attention; hallucinations and delusions; judgment; insight), mood and affect (happy, depressed, anxious, facial and emotional expressions, suicidal and homicidal ideation).  Id.

    Dr. Spurlock saw plaintiff one time in late 2006.  Dr. Spurlock performed a mental status exam (and the records actually use the words "mental status exam, as pointed out by plaintiff), finding that plaintiff had normal speech, memory, thought process, insight, judgment and intellect.  He was pleasant, cooperative, alert, oriented x4, and had good eye contact.  He denied suicidal ideation, affect was somewhat blunted, thought processes were linear.  Memory was intact.

_____

[10]www.psychpage.com/learning/library/assess/mse.htm; accord http://www.loyola.edu/pastoralcounseling/forms/2009/Mental_Status_Exam.pdf (Loyola University); http://metapsychology.mentalhelp.net/images/clientid_125/mentalstatusexam.pdf (Access Behavioral Health); http://www.psych.uic.edu/psyclerk/psychiatric.htm

During subsequent visits in 2008[11] during which plaintiff claims no mental status exams were done, Dr. Spurlock evaluated the following, all of which are part of a mental status exam:

March 28, 2008 – suicidal ideation, distractibility, hopelessness, helplessness, depression, anxiety, appearance, mood and affect, grooming, eye contact, speech, thought processes, memory, concentration, ability to focus, judgment and insight. Although the medical record did not specifically use the words "mental status exam," the record says, "PE [physical exam], Psychiatric".

May 13, 2008 – hopelessness, helplessness, suicidal ideation, anxiety, depression, mood, affect, grooming, eye contact, speech, thought, cognition, memory, concentration, judgment, and insight. Although the medical record did not specifically use the words "mental status exam," the record says, "PE [physical exam], Psychiatric".

June 25, 2008 – hopelessness, anxiety, depression, mood, affect, appearance, grooming, eye contact, speech, thought,

_____

[11]In his brief, plaintiff argues that there were seven additional visits with Dr. Spurlock. The first of these is April 9, 2007, and plaintiff cites to page 449 of the record in support. Page 449 lists Todd Hill as the provider, not Dr. Spurlock. In addition, the record lists nothing more than medications. It is unclear whether plaintiff actually saw a doctor on that occasion. In any event, because it does not indicate that plaintiff saw Dr. Spurlock, that record is irrelevant to this particular argument.

cognition, memory, concentration, serial 7's, abstract thinking, judgment and insight.  Although the medical record did not specifically use the words "mental status exam," the record says, "PE [physical exam], Psychiatric".

July 30, 2008 - hopelessness, helplessness, thought, speech, suicidal ideation, anxiety, depression, mood, affect, grooming, eye contact, appearance, cognition, memory, concentration, judgment and insight.  Although the medical record did not specifically use the words "mental status exam," the record says, "PE [physical exam], Psychiatric".

August 27, 2008 - mood, anxiety, depression, hopelessness, speech, suicidal ideation, mood, affect, appearance, grooming, eye contact, thought, cognition, memory, concentration, judgment and insight.  Although the medical record did not specifically use the words "mental status exam," the record says, "PE [physical exam], Psychiatric".

September 25, 2008 - anxiety, depression, suicidal ideation, behavior (pleasant/cooperative), appearance, mood, affect, fatigue, eye contact, grooming, speech, cognition, memory, concentration, judgment and insight.  Although the medical record did not specifically use the words "mental status exam," the record says, "PE [physical exam], Psychiatric".

Plaintiff argues that:

> Certainly there are not "repeated" Mental Status
> Examinations by Dr. Spurlock.  This error is crucial as the
> ALJ uses the "repeated" Mental Status Examinations statement
> for the conclusion there were no "significant deficits in
> the claimant's attention, concentration or memory."

Clearly Dr. Spurlock performed mental status exams during

every visit.  Even though he called them "physical exams,

psychiatric" rather than "mental status examinations," he covered

the same material as that covered in mental status exams.  Mere

word choice does not change the fact that the exams were indeed

mental status exams.  The ALJ properly relied on Dr. Spurlock's

essentially normal findings in "repeated mental status exams"

because that is precisely what Dr. Spurlock conducted during

plaintiff's office visits.

Plaintiff's second argument – that the ALJ's reliance on Dr.

Spurlock's records to conclude that plaintiff did not have a

severe mental impairment lasting at least 12 months -- is

likewise without merit.  In support of this argument, plaintiff

points out the following:

> Dr. Spurlock was not the only person to examine or treat St.
> John.  Other medical chart entries that indicate a serious
> mental health problem include the following:
>
>> Gregory B. Barber, MD/Consultants In Gastroenterology
>> 11-15-05  "He may have some depression."
>>
>> H. Andrew Pickett, MD - primary care physician
>> 3-15-6 - "Very depressed lately. When his hamster,
>> Sonny, died this weekend, it threw him back into a bad

depression. He is on Paxil. . . . Also he has a Hx of bipolar illness."

3-23-06 – "Refill Xanax."

4-6-06 – "Trouble with depression. . . A: Depression/bipolar."

Yunxia Wang, MD/Assistant Professor – U Kansas Medical Center
1-17-07 – "Significant for signs of depression, . . . nervousness."

After citing these references in the record, plaintiff argues that the ALJ cannot "cherry-pick" evidence and ignore evidence contrary to his decision.

The first reference -- to Dr. Barber -- came in this context: Plaintiff had been experiencing right upper quadrant and right flank pain. He was sent to a gastroenterologist, Dr. Barber, who performed a CAT scan, PIPIDA scan, gallbladder ultrasound, upper GI and small bowel follow-through, "all of which are negative." Dr. Barber noted that plaintiff had had a trial of physical therapy for musculoskeletal pain which was not helpful. "It is certainly clear on his history that he is under a great deal of stress at work, and this is exacerbating his symptomatology. He does carry an underlying diagnosis of irritable bowel syndrome." The remainder of his physical examination that day was normal, and all of his blood work was normal. Dr. Barber concluded as follows:

> Andy, I think that this is probably irritable bowel
> syndrome, and he may have some depression and some
> aggravation.  Gallbladder disease is not completely ruled
> out, though his symptomatology is atypical for it.

The ALJ did not even mention Dr. Barber in his opinion.  Dr.
Barber is a gastroenterologist who suggested that the extreme
stress -- as reported by plaintiff in his medical history --
under which plaintiff was suffering "at work" may be exacerbating
his irritable bowel syndrome and causing the reported pain.  Dr.
Barber did no tests to determine whether plaintiff was suffering
from a mental impairment, as did Dr. Spurlock.  He is not a
mental health expert as is Dr. Spurlock.  Dr. Barber's suggestion
that plaintiff's subjective reports of work-related stress was
merely an attempt to explain plaintiff's right upper quadrant and
right flank pain given all of his normal test results.

If Dr. Barber's statement could be characterized as a
diagnosis, it would have been analyzed as an opinion by a
treating physician by examining (1) the length of the treatment
relationship, (2) frequency of examinations, (3) nature and
extent of the treatment relationship, (4) supportability by
medical signs and laboratory findings, (5) consistency of the
opinion with the record as a whole, and (6) specialization of the
doctor.  20 C.F.R. § 404.1527(d)(2) - (5).  It appears from the
record that plaintiff only saw Dr. Barber one time at the request
of Dr. Pickett to rule out GI causes for plaintiff's reported

pain.  Dr. Barber did not examine plaintiff to determine whether
he suffered from a mental impairment, he performed no tests, and
there are no medical signs or laboratory findings supporting an
official diagnosis of depression.  And finally, Dr. Barber is a
gastroenterologist, not a mental health professional.  The ALJ
was certainly justified in failing even to identify this
statement in Dr. Barber's record as a diagnosis of a severe
mental impairment.

The ALJ adequately discredited the opinion of Dr. Pickett
with respect to plaintiff's physical impairments.  As far as
plaintiff's mental impairment, Dr. Pickett did not treat him for
a mental impairment outside of a period of three weeks when
plaintiff was depressed over the death of a hamster.  During the
first visit when Dr. Pickett mentioned plaintiff's depression, it
was listed under the "chief complaint" and "subjective" portions
of the medical record, meaning these were plaintiff's complaints,
not Dr. Pickett's findings.  Under the objective portion of the
form, Dr. Pickett noted that plaintiff was well developed, well
nourished, in no apparent distress, his lungs were clear to
auscultation, his heart rate was regular, and his abdomen was
supple.  Dr. Pickett did absolutely no mental health testing --
he did not even record any observations that would be related to
a mental status exam.  His assessment of depression was based

solely on plaintiff's complaint of situational depression and his subjective statement of having a history of bipolar disorder (although Dr. Pickett stated he did not think the bipolar disorder was related to the depression). And he told plaintiff to follow up with a psychiatrist. A week later, he refilled plaintiff's Xanax without even seeing plaintiff. Finally, two weeks after that, he noted that plaintiff's depression was "much, much better" and that plaintiff's remaining problem was trouble sleeping. I note that in addition to diagnosing depression on this visit, Dr. Pickett also diagnosed bipolar illness, again with nothing more than plaintiff's subjective statement the month earlier that he has a history of that condition.

I find that the ALJ did not err in failing to consider these brief references to depression to be substantial evidence of a severe mental impairment, either alone or in combination with any other medical record. (I also note that two references to depression and one refill of an antidepressant over a three-week period would not make much difference, if any, when combined with the records of Dr. Spurlock from two years in the future.)

Finally, plaintiff points out one reference to signs of depression and nervousness by a neurologist in 2007 as additional evidence of a long-standing mental impairment. Dr. Wang noted, under "review of systems," "significant for signs of depression,

insomnia, nervousness, joint pain and joint stiffness, difficulty with walking, numbness and tingling sensation." She conducted a mental status exam and noted that plaintiff's speech was fluent with normal comprehension ability, recent and remote memory intact. She did not diagnose depression or any other mental condition.

Dr. Wang saw plaintiff on one occasion as a neurology consult, and she did not diagnose any mental impairment after finding that the mental status exam was normal. The ALJ did not err in failing to consider the reference to "signs of depression" as evidence of a severe mental impairment.

Based on all of the above, I find that the ALJ properly considered the repeated mental status exams by Dr. Spurlock which were all essentially normal as evidence that plaintiff did not have a severe mental impairment. None of the evidence cited by plaintiff in his brief supports a finding of a severe mental impairment. Therefore, plaintiff's motion for summary judgment on this basis will be denied.

### VII. SEVERE IMPAIRMENTS

Plaintiff next argues that the ALJ ignored Dr. Spurlock's treatment notes which assign a global assessment of functioning of "50" on one occasion, "50-55" on three occasions, and "55-60" on two occasions. A global assessment of functioning, or GAF, of

50 means serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

A GAF of 51-60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

The GAF scale is intended for practitioners' use in making treatment decisions. DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, 30-31 (4th ed. 1994). Neither Social Security regulations nor case law require an ALJ to determine the extent of an individual's mental impairment based solely on a GAF score. In fact, the Commissioner declined to endorse the GAF scale for "use in the Social Security and [Supplemental Security Income] disability programs," indicating that GAF scores have no "direct correlation to the severity requirements of the mental disorders listings." 65 Fed. Reg. 50746, 50764-65, 2000 WL 1173632 (August 21, 2000). See also Howard v. Commissioner of Social Security, 276 F.3d 235, 241 (6th Cir. 2002) (holding that a GAF score may assist ALJ in formulating claimant's residual functional capacity, but "is not essential to the [residual functional capacity's] accuracy").

The ALJ explicitly gave great weight to the treatment records of Dr. Spurlock. The ALJ noted that Dr. Spurlock's records consistently showed essentially normal mental status exams with the exception of depression and anxiety. Even Dr. Spurlock's GAF scores do not indicate a severe mental impairment lasting at least 12 months -- the GAF scores assigned most often indicate symptoms suggesting plaintiff would have conflicts with peers or co-workers, not that he would be unable to work. Dr. Spurlock never expressed an opinion that plaintiff was unable to work or that plaintiff suffered from a severe mental impairment.

Additionally, in his administrative paperwork, plaintiff indicated no problem with memory, concentration, understanding, following instructions, paying attention, finishing what he starts, or handling changes in routine (Tr. at 132-136).

The ALJ did not err in finding that plaintiff's mental impairment was not severe.

Plaintiff also argues that the ALJ erred in finding that plaintiff's hand problems do not constitute a severe impairment.

A severe impairment is an impairment or combination of impairments which significantly limits a claimant's physical or mental ability to perform basic work activities without regard to age, education, or work experience. 20 C.F.R. §§ 404.1520(c), 404.1521(a), 416.920(c), 416.921(a).

The regulations, at 20 C.F.R. § 404.1521, define a non-severe impairment.

> (a)  Non-severe impairment(s).  An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities.

> (b)  Basic work activities. When we talk about basic work activities, we mean the abilities and aptitudes necessary to do most jobs.  Examples of these include--

>> (1)  Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;

>> (2)  Capacities for seeing, hearing, and speaking;

>> (3)  Understanding, carrying out, and remembering simple instructions;

>> (4)  Use of judgment;

>> (5)  Responding appropriately to supervision, co-workers and usual work situations; and

>> (6)  Dealing with changes in a routine work setting.

In plaintiff's administrative paperwork, he indicated that he had no difficulty using his hands (Tr. at 136).  He testified during the administrative hearing that he is able to use a knife, fork, and spoon, despite his alleged hand-shaking.

The only citations to the medical records by plaintiff in his brief are references to "left sided weakness" or weakness in the arm.  There are no references to any problems with plaintiff's hands -- specifically to a problem with gripping or

plaintiff's hands constantly shaking.  In any event, plaintiff's testimony that he is able to use a knife, fork, and spoon belies any theory that his hand-shaking is a severe impairment.  A severe impairment is one which significantly limits a person's ability to walk, stand, sit, lift, push, pull, reach, carry, or handle.  Plaintiff testified that he could carry five or six pounds with one hand.  He testified that he can use a knife, fork, and spoon.  The medical records do not contain any complaint of hand shaking or an inability to carry or handle objects.  There simply is no evidence that plaintiff has a severe impairment based on his hands shaking.

## VIII. ABSENTEEISM TO SEEK MEDICAL TREATMENT

Finally, plaintiff argues that because the medical records show that he was treated for health care conditions on a total of 68 different dates during a 40-month period, the ALJ's testimony that a person can only miss one day per month dictates a finding of disability.  This argument is without merit.  There is no evidence that plaintiff's doctor appointments all lasted an entire workday.  Many people remain gainfully employed while seeking regular and frequent medical care by using sick time in increments rather than using an entire day for a doctor visit.  Not surprisingly, plaintiff has cited no legal authority for the proposition that more than one doctor visit a month will render a

person disabled, especially without any evidence that ongoing and regular medical treatment is necessary.

## IX. CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.


_/s/ Robert E. Larsen_
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
September 21, 2010